UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| JANE JONES, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 09-CV-80-B-W |
| | ) | |
| TOWN OF MILO, *et al.*, | ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION ON MOTION TO DISMISS BY
DEFENDANTS BERES, BROWN, AND GALLAGHER**

Jane Jones, formerly the Town Manager of Milo, has sued her former employer and four

of the Town's selectpersons in both their official and personal capacities for breach of contract,

negligent and intentional infliction of emotional distress, intentional interference with contractual

relationship, defamation, conspiracy under 42 U.S.C. § 1983, violation of procedural due

process, violation of substantive due process, and violation of the First Amendment.  Each of the

nine substantive counts[1] is directed at all of the defendants.  Three of the four individual

defendants, Joseph Beres, Jerry Brown, and Richard Gallagher ("Movants"), have moved to

dismiss the complaint as it pertains to them.  Plaintiff Jones, in her response, has conceded that

the state tort claims fail because of the immunity defenses raised by the Movants and she also

has conceded that the official capacity claims against the Movants are redundant of the claim

against the Town of Milo and should be dismissed.  Thus, as directed against these three

Movants, the remaining claims in the complaint are four personal-capacity civil rights (§ 1983)

_____

[1] There is a tenth count for punitive damages.

claims and a breach of contract claim.  The Court referred the motion for report and

recommendation on May 12, 2009.  I recommend that the Court grant the motion to dismiss with

respect to all claims against the Movants in both their official and personal capacities.

## The Material Factual Allegations

The following description of the case is penned for purposes of resolving a motion to

dismiss, which means that it is drawn from the material, non-conclusory allegations set forth in

the Plaintiff's complaint.  Those allegations must be regarded as true, whether they are disputed

by the Movants or not.  In addition to the material allegations, the following recitation includes

references to certain documents referred to in the Plaintiff's complaint, copies of which have

been attached to the Movants' motion.  In her opposition to the motion, the Plaintiff does not take

issue with the incorporation of these documents, whether on authenticity grounds or otherwise.

Under circumstances such as these, the Court may consult the documents to the extent they are

actually referred to in the complaint—or are central to the Plaintiff's claim—and are material to

issues raised in the motion, without thereby converting the motion to dismiss into a motion for

summary judgment.  See Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993).

Plaintiff Jane Jones is a resident of Milo, Maine, and served as the Milo Town Manager

for 17 years.  (Compl. ¶¶ 3, 9.)  At all times relevant to this action, Defendants Joseph Beres,

Jerry Brown, and Richard Gallagher ("Movants") were duly elected selectmen of the Town of

Milo.  (Id. ¶¶ 5-7.)

During the period of Jones's employment with the Town, she had either an oral or

written, year-to-year contract of employment.  (Id. ¶ 10.)  That contract called for Jones to

receive a written evaluation in January, in advance of the ensuing year's employment contract.

(Id. ¶¶ 11, 16.)  During many years of employment, Jones continued in her position without a

2

written employment contract.  (Id. ¶ 12.)  For sixteen of the seventeen years of employment as town manager, Jones received "excellent evaluations for her performance."  (Id. ¶ 13.)  During calendar year 2007, Jones continued her employment as town manager without a written employment contract.  (Id. ¶¶ 14-15.)  In January of that year, and repeatedly through July, Jones asked the Milo Board of Selectmen to evaluate her performance.  (Id. ¶¶ 17, 19.)  Eventually, in late July 2007, Jones received a performance evaluation.  (Id. ¶ 20.)  For the first time in seventeen years, Jones received an evaluation that did not characterize her performance as excellent.  (Id. ¶ 21.)

The evaluation session that produced Jones's evaluation was conducted by the Board without Jones being present.  (Id. ¶ 22.)  Jones asked to be included, but her request was denied. (Id. ¶ 23.)  After the evaluation session, Board Chair Jerry Brown informed Jones that her performance was evaluated as satisfactory.  (Id. ¶ 24.)  She was advised to work on four areas: (1) to complete certain accounting work before the first of November;  (2) to rewrite the Town's personnel policies before the first of November;  (3) to meet weekly with her department heads; and (4) to establish a rapport with the Town of Brownville.  (Id. ¶ 25.)   No other weaknesses or deficiencies in performance were noted.  (Id. ¶ 26.)  The Board did not provide Jones with a written performance evaluation.  (Id. ¶ 27.)  When told of this performance review, Selectman Brown stated to Jones:

> I realize you are a very private person.  I believe that you should go to church in town and attend basketball games.  I go to girls basketball games even though I hate them.  People would be less likely to believe Tony [Hamlin's] stories if you did.

(Id. ¶ 28).

According to the complaint, for months during late 2006 and throughout 2007, Defendant Selectman Tony Hamlin (not one of the movants) was degrading and insulting to Jones during

public board sessions in unspecified ways.  (Id. ¶ 29.)  On November 3, 2006, Selectman Hamlin said to Jones that it would take six months to get her out of her job but that he would do it.  (Id. ¶ 30.)  On August 1, 2007, at a special town meeting, Hamlin accused Jones in public of "fudging the figures."  (Id. ¶ 31.)  Further, Hamlin frequently discussed Jones's job performance during public meetings, failing to go into executive session to do so.  (Id. ¶ 32.)  On August 8, 2007, Hamlin said to Jones:  "At your age, it's going to be a little tough to get another tit job."  (Id. ¶ 33.)  Selectman Hamlin, without the approval of the Board, met with Milo resident Jeff Gahagan "about becoming the new town manager when Jones was fired."  (Id. ¶ 34.)[2]

On September 13, 2007, at the Board's regular meeting, Selectman Brown moved to enter executive session to discuss a personnel and legal matter.  Selectman Beres seconded the motion and it passed unanimously.  (Id. ¶ 37.)  During the ensuing executive session, Jones was informed that she would be suspended on administrative leave for 45 days, with pay, for insubordination.  (Id. ¶¶ 38, 40.)  Chairman Cole resigned immediately following the September 13 executive session, allegedly due to the treatment Jones received from the defendant board members.  (Id. ¶ 42.)  Upon reconvening the regular board meeting, Selectman Brown moved to place Jones on leave for 45 days on charges of financial misconduct.  (Id. ¶ 43.)  Defendant Tony Hamlin then moved to elect Brown as the new chairman.  (Id. ¶ 44.)  Selectman Hamlin moved that the municipal police chief escort Jones "out of *her office*" that night with only her personal belongings.  (Id. ¶ 46 (emphasis added).)  The Board adopted the motion and Jones alleges that, as a consequence, she was denied her constitutional right to attend the regular Board meeting that evening.  (Id. ¶ 41.)  Although the motion did not forbid Jones's attendance at the public portion of the meeting, Jones alleges that Hamlin told the Chief of Police "to not allow [Jones] to enter the regular selectmen's meeting."  (Id. ¶ 39.)  The Board did not provide Jones at that time with a

---

[2]       For reference, Jeff Gahagan is the current Town Manager of Milo.

written list of the accusations against her.  (Id. ¶ 47.)  Plaintiff denies ever engaging in financial misconduct while employed as town manager.  (Id. ¶ 45.)  Forty-nine residents of Milo and numerous other members of the public and press attended the September 13 meeting.  (Id. ¶ 62.)

The Board noticed its next meeting for September 20, 2007.  Before that meeting, the Board convened without public notice on the morning of September 15, 2007, entering executive session for roughly one-half hour.  (Id. ¶¶ 48, 51.)  The topic of the September 15 meeting was Jones's employment.  (Compl. ¶ 50).

Jones later received a letter signed by Chairman Brown, dated September 21, 2007. (Doc. 10-7.)  The letter included "the addendum to the Town of Milo Resolution passed September 13, 2007 concerning  [the] [j]ust cause clause in the Town Charter and the temporary suspension of the Town Manager, Jane Jones," which addendum was approved by the Board September 20, 2007.  (Id.)  Jones references the letter in her complaint and states that it identified new and different allegations of misconduct that Jones was not told of when first placed on suspension.  (Compl.  ¶ 52.)  The allegations included:

failure to forward management letters to the Selectmen;

shredding public documents;

violating the executive session seal;

paying a municipal employee in a manner to avoid employment taxes;

failing to fulfill fiduciary duties to the Town, as reflected in an auditor's report, and failure to forward an invoice for reimbursement to the Maine State Police in the amount of $28,000;  and

insubordination related to a failure to follow two specified board directives.

(Id. ¶ 53;  see also Letter *re.* addendum to resolution, Doc. 10-7.)[3]  According to Jones, none of the new charges identified the financial misconduct of which Jones was accused on September 13, 2007, in public session.   (Id. ¶ 54.)

Jones asserts that, prior to the executive session and the regularly scheduled board meeting of September 13, 2007, the Defendants prepared a written resolution to be adopted at the board meeting.  (Id. ¶ 57.)  The resolution, though prepared before the executive session of September 13, 2007, referenced financial misconduct rather than insubordination.  (Id. ¶ 58.) This resolution was moved by Defendant Brown and seconded by Defendant Beres and passed unanimously by all Defendants.   (Id. ¶ 59.)  The Defendants had to know prior to the executive session that they were placing Jones on leave for financial misconduct as they had prepared the resolution in advance.  (Id. ¶ 60.)  The resolution was read aloud at the September 13 meeting when it was acted on.  (Id. ¶ 61.)

Jones's complaint asserts that she never mismanaged the fiscal accounts of the Town of Milo and that the Defendants' statements concerning "financial misconduct" are untrue.  (Id. ¶¶ 70-71.)  She alleges that she was denied access to the Milo Town Office after September 13, 2007.  (Id. ¶ 72.)  Jones requested a complete copy of her personnel file after her termination. (Id. ¶ 74.)  Substantive portions of her file had been removed.  (Id. ¶ 75.)

Jones alleges that Defendant Brown "assumed" the position of town manager and received compensation for his efforts.   (Id. ¶¶ 76-77.)  Because of the assumption of her duties, Jones faults Brown's continuing participation in her employment matter.  (Id. ¶ 79.)  The allegations related to Brown's assumption of the town manger position are not the model of clarity.  For instance, Jones does not allege that Brown is the town manager or ever sought to

---

[3]     Jones does not mention in her complaint the alleged failure to forward an invoice to the Maine State Police, though it is stated in the letter alongside the other charges.

replace her as the town manger.  The plausible inference seems to be that he temporarily assumed her duties in her absence.

The Board conducted a hearing concerning Jones's employment on November 1, 2007, and voted to terminate Jones's employment.  (Id. ¶¶ 79, 85.)  Jones alleges that she responded to and rebutted every allegation raised against her.  (Id. ¶ 82.)  Jones complains that, although she was told she had until November 1, 2007, to correct shortcomings in her performance, the Board precluded her from accomplishing those tasks because of her suspension on September 13, 2007.  (Id. ¶ 81.)  Jones alleges that the Board came to the hearing "predetermined."  (Id. ¶ 86.)  According to Jones, the Board did not present any witnesses to support the termination.  (Id. ¶ 83).

Jones has been unable to secure employment as a town manager in any other town to which she has applied.  (Id. ¶ 88.)  At the time of the suspension, Jones was one of three finalists for the position of town manager in the Town of Milford.  (Id. ¶ 89.)  After the publication of the charge of "financial misconduct," she never received a call back for her second and final interview.  (Id. ¶ 90.)  Recently, Jones applied for the position of town manager in the Town of Orrington, Maine.  (Id. ¶ 91.)  Again, she was one of three finalists.  (Id. ¶ 92.)  During a second interview she was asked about the charges of "financial misconduct" and was not ultimately hired for the position.  (Id. ¶¶ 93-94.)  In addition to pecuniary damages, Jones alleges significant emotional harm.  (Id. ¶ 95-97.)

Jones's complaint recites the following causes of action, by count:  (I) breach of contract; (II) negligent infliction of emotional distress;  (III) intentional infliction of emotional distress; (IV) interference with contractual relationship;  (V) defamation;  (VI) conspiracy under 42 U.S.C. § 1983;  (VII) a procedural due process claim under § 1983;  (VIII) substantive due

7

process claim under § 1983;  (IX) a First Amendment claim;  and (X) a plea for punitive damages.

### The Dismissal Standard

A motion under Rule 12(b)(6) tests the legal sufficiency of the complaint, whether the claim, as alleged, is sufficient "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The plaintiff is not required to prove her allegations in order to overcome the motion.  The question is simply whether the factual allegations, taken as true, are enough to "establish a 'claim to relief that is plausible on its face.'"  Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 320 (1st Cir. 2008) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Plausibility, rather than possibility, is the benchmark.

The plausibility standard was newly announced by the Supreme Court in Bell Atlantic Corporation v. Twombly.  The Supreme Court introduced the standard in order to "retire" an earlier, inaccurate voicing that suggested dismissal of a complaint was forbidden unless a court could think of "no set of facts" consistent with the allegations that might result in liability for the defendant.  Twombly, 550 U.S. at 562-63 (discussing how the "no set of facts" phrase coined in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), was "an incomplete, negative gloss on an accepted . . . standard").  The emphasis on plausibility gives the dismissal standard "more heft" than what was suggested by the old "no set of facts" gloss.  ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008);  see also EEOC v. Concentra Health Serv., Inc., 496 F.3d 773, 776 (7th Cir. 2007).

Application of the plausibility standard to any given cause of action is, at present, somewhat uncertain.  The general rule governing pleadings is Rule 8 of the Federal Rules of Civil Procedure.  As it is written, Rule 8(a)(2) requires only a short and plain statement of the

claim showing that the pleader is entitled to relief.  The Rule condones "notice" pleading, a form of pleading that is minimally sufficient to give the defendant fair notice of the grounds for the claim.  <u>Twombly</u>, 550 U.S. at 555.  Yet, while a complaint need not contain detailed factual allegations, the plaintiff cannot rely entirely on "a formulaic recitation of the elements of a cause of action," <u>id.</u>, "an unadorned, the-defendant-unlawfully-harmed-me accusation," <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009), or similarly bald assertions.   A court need not accept conclusory recitations of legal standards as factual allegations at all, because such recitations do not tend to divulge the factual underpinnings of the case and require the court reviewing the complaint to speculate as to the existence of discoverable facts supportive of the legal theory at hand.  <u>Id.</u> at 1949-50;  <u>Twombly</u>, 550 U.S. at 555-56.  In addition to unreliable conclusory allegations, there are occasions when actual allegations of fact will be merely "suggestive" of liability.  This is where the plausibility standard adds bite.  For example, when the factual allegations in the complaint are measured against the legal standard for liability and the allegations are no more suggestive of a factual scenario in which liability might be imposed, than a scenario in which liability could not be imposed, the court, it now seems, should refrain from inferring the existence of unstated facts consistent with the former scenario.  Thus far, the Supreme Court has demonstrated this shifting paradigm in two relatively narrow legal areas:  in antitrust litigation, with respect to a conclusory recitation that there exists an agreement in restraint of trade, which is supported only by factual allegations of parallel market conduct, <u>Twombly</u>, 550 U.S. at 556-57, and in civil rights litigation, with respect to a conclusory recitation that supervisory officials condoned a policy based on a discriminatory motive, which is supported only by factual allegations reflecting the supervisor's knowledge that an approved course of action has a disproportionate impact on a specific racial minority, but which can be

justified by legitimate police-power objectives.  Iqbal, 129 S. Ct. at 1950-52.  In each of these instances, the Supreme Court explained that the claims could not go forward because there was an "obvious alternative explanation" for the factual scenario described in the complaint, which made the related conclusory allegations of unlawful purpose possible, but less than plausible.  Id. at 1951;  Twombly, 550 U.S. at 567.  Only plausible inferences are to be drawn.

In conclusion, when a plaintiff relies on an inference to state a claim, a court can only indulge that inference if the factual allegations in the complaint make the inference plausible.  A court may not indulge an inference exposing the defendant to liability, however, when the factual allegations support a more likely inferential finding that is incompatible with liability.  Iqbal, 129 S. Ct. at 1950 (explaining that, in Twombly, the Court rejected an inference of an unlawful agreement in restraint of trade because the facts alleged were "not only compatible with, but indeed [were] more likely explained by, lawful . . . behavior").

### Discussion

The Defendants' motion challenges the complaint on a variety of levels.  Structurally, the Defendants assert that the "official capacity" claims against them should be dismissed because Jones has also sued the Town of Milo, making the official capacity claims against them redundant.  (Mot. at 9.)  Jones does not contest this assertion in her opposition.  Because the Town of Milo has been named as a defendant, the official capacity claims against the individual defendants should be dismissed as redundant claims, Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Dep't, 533 F.3d 780, 799 (9th Cir. 2009) (applying the reasoning of Kentucky v. Graham, 473 U.S. 159, 165-66 (1985)).

The Movants next assert that they are entitled to qualified immunity against the civil rights claims.  (Mot. at 9-10.)  They argue that they are entitled to dismissal of the constitutional

claims against them because Jones's complaint fails to depict a violation of any clearly established constitutional right.  (Id. at 11.)   They also argue that state law immunity doctrines shield them from liability on the state law claims and that they are not proper defendants on the breach of contract claim.  (Id. at 16-19.)  I begin with the federal claims.

A.      **The Civil Rights Claims and Qualified Immunity**

Jones's federal claims all fall under the aegis of the Civil Rights Act, 42 U.S.C. § 1983. Section 1983 of the Civil Rights Act confers upon every United States citizen a right to redress against any person who, acting under color of state law, causes a deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  43 U.S.C. § 1983.  A section 1983 claim does not lie absent state action, Alexis v. McDonald's Rest., 67 F.3d 341, 351 (1st Cir. 1995), and the individual defendants are subject to claims under § 1983 solely because they were cloaked with state authority when they acted in their capacity as municipal officers.  The movants do not dispute that they were state actors with respect to Jones's termination.  They argue only that their conduct, as alleged, did not violate clearly established constitutional law and that, consequently, they are immune to personal capacity claims.

The Supreme Court's opinions "consistently have held that government officials are entitled to some form of immunity from suits for damages.  As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "In the last analysis, . . . qualified immunity purposes to protect government functionaries who could not reasonably have predicted that their actions would abridge the rights of others, even though, at the end of the day, those officials may have engaged in rights-violating conduct."  Camilo-Robles v. Zapata, 175 F.3d 41, 43 (1st Cir. 1999).  In this way, the doctrine of

qualified immunity protects a state actor from litigation in circumstances where the proper application of the underlying constitutional standard is unclear and, therefore, not otherwise suited for dismissal or summary disposition.  With respect to the extent of the protection conferred by the doctrine, it has been said that the doctrine "leaves 'ample room for mistaken judgments' and protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Berthiaume v. Caron, 142 F.3d 12, 15 (1st Cir. 1998) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  The availability of qualified immunity turns on two considerations:  "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation."  Pearson v. Callahan, 129 S. Ct. 808, 815-16 (2009).  The second aspect of this test "focuses . . . on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights."  Maldonado v. Fontanes, ___ F.3d ____, ____, 2009 WL 1547737, *4 (1st Cir. June 4, 2009).  "[T]his inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"  Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).

### 1.   Due process

Jones alleges a violation of her right to procedural due process and a violation of a substantive due process right as well.  With respect to procedural due process, the complaint includes allegations related to the sufficiency of predeprivation process, the impartiality of the Board, and a conclusory conspiracy theory.  (Compl. ¶¶ 131-134.)  With respect to substantive due process, the complaint emphasizes the defamatory nature of the proceedings and the alleged

absence of evidentiary support for the Board's findings.  (Id. ¶¶ 140-143.)  I address each of the theories in turn.

> a.   *Procedural due process*

In her opposition memorandum, Jones focuses much of her argument on the idea that she did not receive adequate process prior to her suspension (as distinguished from her eventual termination).  The Court should dismiss this theory of liability because placement on paid administrative leave is not a deprivation that requires any predeprivation process.  Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 9 (1st Cir. 2003).  "The Supreme Court explained in Loudermill that a government employer who wishes to remove a worker immediately may suspend that worker with pay until the procedures associated with termination can be completed."  Id. (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 544-45 (1985)).  Moreover, it is incorrect to state that the Board could not develop additional reasons for termination subsequent to the decision to suspend Jones.  Beattie v. Roberts, 436 F.2d 747, 750 (1st Cir. 1971) ("Nor are we able to attach material significance to the fact that two of the events included in the list of reasons occurred after the November 18 meeting when the Committee voted to dismiss plaintiff. We see no reason why the Committee should have ignored incidents occurring after November 18 as long as plaintiff was put on notice before the January 21 hearing of all such events the Committee would consider."), overruled on other grounds, Raper v. Lucey, 488 F.2d 748, 751 n.3 (1st Cir. 1973).  It was not unlawful for the Movants to vote to suspend Jones with pay, without giving her advance notice of the grounds and/or a hearing.

As for her eventual termination, Jones argues that she was short-changed, procedurally, because "[t]here was no evidence produced to counter her rebuttal to each allegation made by the Selectmen."  (Opposition Mem. at 9.)  She also alleges in her complaint that the Board

13

"presented no witnesses."  (Compl. ¶ 83.)  These allegations state a plausible claim of a due

process violation.  However, the Movants would not reasonably have understood that their

actions necessarily violated Jones's constitutional rights.  I explain the basis for that conclusion

below, but first I address the bias claim against the Movants, which does not present such a close

question.

i.  bias

In addition to her claim that she was denied adequate process related to the Board's

evidentiary presentation, Jones also alleges that the Board was "predetermined" to fire her on

account of bias.  I agree with the Movants that the allegations of bias on their part are not

sufficient to expose them to liability for money damages because the allegations do not suggest

that the Movants harbored the kind of bias that would have disqualified them from participating

at her hearing.  Jones fails to state a claim of disqualifying bias against the Movants.

It is commonly the case that a public employer will both instigate the charges against the

employee and preside over the termination hearing.  This kind of bias is an accepted part of due

process predeprivation hearings.  Acosta-Sepulveda v. Hernandez-Purcell, 889 F.2d 9, 12 (1st

Cir. 1989) ("[I]t is not required that a hearing be conducted before an impartial decisionmaker.

In fact, the hearing may be presided over by the employer [it]self.");  see also Withrow v. Larkin,

421 U.S. 35, 55 (1975) (condoning the delegation of both investigatory and adjudicatory

functions to due process tribunal having ultimate administrative fact-finding and disciplinary

authority).  Still, it is also an accepted part of due process jurisprudence that bias can reach an

intolerable level.  Chmielinski v. Mass. Office of the Comm'r of Prob., 513 F.3d 309, 317-18 (1st

Cir. 2008) (affirming dismissal of due process claim alleging bias on the part of hearing officer

but recognizing that a claim could exist if there were more serious allegations).  A noted example

14

of such a case is where the decisionmaker has a "direct, personal, substantial, pecuniary interest"

in the outcome.  Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 821-22 (1986) (vacating 5-4

decision of Alabama Supreme Court where one justice had a direct and significant financial stake

in the outcome of the legal issue under review);  Tumey v. Ohio, 273 U.S. 510, 523 (1927)

(invalidating trial-by-mayor of Prohibition charges, where the law gave one-half of any fine to

the municipal body whose mayor heard the case).  There is no precise standard for when this line

is crossed, but the Supreme Court has held that the question is whether there would be "a

possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear

and true."  Lavoie, 273 U.S. at 822 (quoting Ward v. Village of Monroeville, 409 U.S. 57, 60

(1972)).  Another example is where the decisionmaker has displayed such personal animosity

that objectivity cannot be presumed, such as where the decisionmaker "has been the target of

personal abuse or criticism from the party before him" and has become embroiled in such a

conflict.  Larkin, 421 U.S. at 47.  See, e.g., Taylor v. Hayes, 418 U.S. 488, 503 (1974)

(prohibiting final contempt disposition and sentence of imprisonment by judge who initially

charged petitioner with contempt where "marked personal feelings were present on both sides"

and "unseemly conduct [had] left personal stings").  With respect to this category of bias, there

must be evidence of a high degree of antagonism as would make a fair determination impossible.

Liteky v. United States, 510 U.S. 540, 555 (1994).  Beyond these examples, the kind of personal

interest that will disqualify a decisionmaker "cannot be defined with precision," In re Murchison,

349 U.S. 133, 136 (1955), but would only reach constitutional dimension "in the most extreme of

cases," Lavoie, 475 U.S. at 821.  In the absence of such circumstances, there is an abiding

"presumption of honesty and integrity in those serving as adjudicators."  Larkin, 421 U.S. at 47.

It is well-recognized that "most matters relating to . . . disqualification [do] not rise to a

constitutional level," <u>FTC v. Cement Inst.</u>, 333 U.S. 683, 702 (1948), and are "matters merely of legislative discretion," <u>Tumey</u>, 273 U.S. at 523.

For purposes of qualified immunity, the question is whether the Movants engaged in conduct that violated a clearly established constitutional right and, if so, whether an objectively reasonable person in their position would have understood the conduct to be unlawful.  <u>Berube v. Conley</u>, 506 F.3d 79, 82 (1st Cir. 2007).  The complaint relates that Brown assumed Jones's duties during her suspension from office and received some compensation for his efforts. However, the complaint does not relate that Brown sought Jones's job for himself or that he held on to it any longer than necessary, such as by postponing the effort to find a replacement for Jones.  I understand the allegations against Brown to describe only a temporary assumption of town manager duties following Jones's suspension.  Nothing in the complaint suggests a more plausible, alternative inference.  These circumstances do not warrant an inference that Brown held a "direct" or "substantial" pecuniary interest in Jones's termination that would disqualify him from participating in the due process hearing.  Consequently, Brown, Beres, and Gallagher are all in the same category when it comes to the allegation that they harbored personal bias against Jones.  They are sued because they voted to terminate Jones's employment while serving on the Board with Defendant Hamlin (who has not joined in their motion).[4]  This is not enough to expose the Movants to liability for money damages and cannot prevent dismissal of the personal-capacity bias claims against the Movants based on qualified immunity, even if it is assumed that Hamlin was disqualified on account of his personal feelings toward Jones.  <u>Hicks v.</u>

---

[4]     Jones does not brief the disqualification issue in her opposition memorandum.  Nor does she even mention Brown's alleged financial conflict of interest in her discussion of the procedural due process claim.  (Opposition Mem. at 8-9.)  Disqualification of a tribunal member under the Due Process Clause is an outer boundary.  <u>Lavoie</u>, 475 U.S. at 828.  Maine law may afford relief for bias, predisposition, or other misconduct on a lesser showing. Certainly, it cannot be said that Maine law does not afford an opportunity to adequately address such matters in the context of postdeprivation judicial process.  <u>Ryan v. Camden</u>, 582 A.2d 973, 975 (Me. 1990).

Watonga, 942 F.2d 737, 750 (10th Cir. 1991) ("A contrary [decision] would place on all administrative tribunal members a duty to ferret out possible bias among their colleagues, or to face civil damages regardless of their own fairness and integrity.  Such a rule would disrupt the functioning of administrative tribunals.").  This motion does not present an occasion to address the allegations of bias on the part of Defendant Hamlin because there is no plausible basis for attributing his alleged bias to the Movants.  As far as the Movants are concerned, Jones fails to state a plausible claim of disqualifying bias.

ii.     procedure

In Cleveland Board of Education v. Loudermill, the Supreme Court prescribed what is minimally sufficient to satisfy procedural due process when it comes to a predeprivation hearing related to the termination of a public employee who has a property interest in continued employment.  470 U.S. at 542.  In this context, "some kind of hearing" that encompasses notice, an explanation of the employer's evidence, and an opportunity to respond is minimally sufficient.  Id. (quoting Board of Regents v. Roth, 408 U.S. 564, 569-70 (1972)).  These three prerequisites of predeprivation employment proceedings are, without question, clearly established in the law.  There is, however, a caveat.  The minimum process condoned by the Supreme Court in Loudermill presumes that a more elaborate hearing will be afforded postdeprivation.  Id. at 546 (explaining: "To require more than this *prior* to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee" (emphasis added), and pointing out that the holding "rests in part on the provisions [of] a full post-termination hearing").  This need for a more elaborate postdeprivation hearing when minimum Loudermill process is afforded predeprivation is clearly established in the sense that someone studied in the law of due process would appreciate that there is a concern here.  However, I do

17

not believe that ordinary, reasonable members of a municipal board would fairly appreciate that the board's actual *adherence* to the <u>Loudermill</u> predeprivation requirements would expose them to a personal capacity claim for money damages simply because the State does not prescribe a postdeprivation hearing at which the employee can confront and call witnesses to challenge the board's predeprivation findings.  It would be well if municipal board members did have this level of knowledge concerning the nuances of the Due Process Clause, but the complaint does not contain any allegations that would explain why it would be plausible for this Court to attribute that level of understanding to the Movants.  Consequently, I recommend that the Court dismiss the personal capacity due process claims against the Movants even though I find it plausible that Jones's allegations she was procedurally shortchanged  by not providing a more elaborate hearing than a "<u>Loudermill</u> hearing" would survive a motion to dismiss for failure to state a claim.  Jones may ultimately prove she is entitled to have her termination set aside, but these circumstances do not warrant an imposition of money damages against the Movants personally.

In this case, the complaint relates that Jones received notice of the employer's grounds for proceeding against her in advance of the November hearing.  Additionally, the complaint divulges that Jones attended her termination hearing and rebutted every allegation raised against her.  The piece that Jones focuses her claim on is the Board's alleged failure to make its own presentation with witnesses.  Of course, <u>Loudermill</u> process requires only an explanation of the employer's evidence, not an evidentiary presentation.  <u>Id.</u> at 542.  Thus, under <u>Loudermill</u>, the Board would not be required to make its own evidentiary presentation with witnesses if the state procedure afforded some further evidentiary hearing postdeprivation.  However, state procedure vested the Board with final administrative decision-making authority with respect to factual findings and the appropriateness of disciplinary measures and it does not appear that the Milo

18

Charter or any other source of state law afforded Jones any postdeprivation remedy other than limited judicial review under Rule 80B of the Maine Rules of Civil Procedure.  If the only hearing afforded to the employee is a pretermination hearing, then minimal <u>Loudermill</u> process likely will not suffice.  <u>See, e.g.</u>, <u>Calhoun v. Gaines</u>, 982 F.2d 1470, 1476 (10th Cir. 1992) (holding that "<u>Loudermill</u> established that some form of pretermination hearing, plus a full-blown adversarial post-termination hearing," are required when a property interest in continued employment is at stake);  <u>and compare</u> <u>Regan v. Sch. Admin. Dist. 63</u>, No. 08-CV-175-B-H, 2009 U.S. Dist. Lexis 41301, 2009 WL 1325166 (D. Me. May, 12, 2009) (Mag. J. Rec. Dec., pending review by District Judge) (recommending dismissal of due process claim alleging predeprivation shortcomings where state discharge procedure called for a postdeprivation hearing).  The point is not that the Board in this case could not have relied entirely on predeprivation process.  The point is that predeprivation process should normally be amplified beyond the minimum process condoned in <u>Loudermill</u> when there is no postdeprivation process available to address factual and disciplinary disputes, although the precise degree to which the process should be amplified is difficult to articulate.  Jones's allegations that she was denied an opportunity to confront the witnesses against her because the Board called no witnesses must be taken as true and is sufficient to plead a plausible claim of a due process violation because this was the only hearing that state process extended to Jones.[5]  All the same, although the state process may be alleged as insufficient, I do not believe that a reasonably prudent person in the

---

[5]     This recommendation is decidedly not based on the idea that this is a "sufficiency of the evidence" claim. If that were all that Jones asserted, her claim would more appropriately be remedied through state court judicial review under Maine Rule 80B and a state law breach of contract claim.  <u>See, e.g.</u>, <u>Ryan v. Town of Camden</u>, 582 A.2d 973, 975 (Me. 1990) (reviewing public employee's termination applying a "substantial evidence" standard); <u>Mercier v. Town of Fairfield</u>, 628 A.2d 1053, 1055 (Me. 1993) (affirming damages award given to discharged town manager on breach of contract claim). Such postdeprivation avenues are sufficient process for addressing a challenge based on an evidentiary error.  <u>Amsden v. Moran</u>, 904 F.2d 748, 756 (1st Cir. 1990).

position of any of the Movants would have been cognizant that a clearly established due process

violation occurred on November 1, 2007, as of the conclusion of the termination hearing.

Even in cases involving due process hearings where no postdeprivation opportunity exists

to have a hearing officer reconsider findings of fact imposed by a predeprivation hearing officer,

courts routinely look to Loudermill to establish the baseline for what is adequate in a

predeprivation proceeding.  See, e.g., Chmielinski v. Massachusetts Office of the Comm'r of

Prob., 513 F.3d 309, 316 (1st Cir. 2009) (citing Loudermill for the proposition that the standard

to provide an adequate hearing is not high).  As the Court of Appeals stated there, an employee is

not entitled to the kind of full-blown trial associated with a court of law.  Id. (rejecting a claim

that due process required employer to provide pre-hearing discovery and sworn and sequestered

witnesses in connection with a predeprivation hearing).  Thus, it is not incumbent upon the

employer to facilitate the employee's defensive investigation, so long as the employer divulges

the evidentiary grounds on which it relies.  Id. at 316-17.  This is particularly so when the

employer's stated grounds involve circumstances that are known to the employee so that the

employee is fully informed as to how to develop a defense.  Id. at 317.  This all goes to the point

that the need for any particular procedural protection beyond those required in Loudermill is a

fact-specific inquiry.  Id.  When the qualified immunity overlay is introduced to protect the

individual actor from litigation in circumstances where the proper application of the underlying

constitutional standard might be unclear, the onus falls on the plaintiff to sketch out, at least, a

plausible basis for understanding why any additional trial-like procedure would be essential to

provide the employee with meaningful protection against an erroneous deprivation.  For

example, the plaintiff might explain which witness's or witnesses' testimony was subject to

reasonable challenge, whether there was a request to secure a witness's testimony that was denied

20

and what made the denial unreasonable under the circumstances, whether there was an item of documentary evidence that could only be authenticated through the testimony of a witness, whether the hearing officers were not independently capable of appreciating the evidence without the aid of third-party witnesses, and so forth, as the factual circumstances may require. To paraphrase the Court of Appeals, the plaintiff should set out facts that explain how the omission of a particular attribute of courtroom procedure "deprived him of the opportunity to put his version of the facts before the decisionmaker," or how "any error of primary facts in the grounds used for termination . . . could be explained only by" omission of the attribute in question. Id. at 318. In the absence of such detail, I conclude that the Court cannot plausibly infer that the alleged procedural transgression can be explained only by incompetence or a knowing violation of the Due Process Clause. Berthiaume, 142 F.3d at 15. It is for that reason that I recommend dismissal of the personal-capacity, procedural due process claim against the Movants on the basis of qualified immunity, even though a plausible procedural due process constitutional violation may have been alleged in connection with Jones's pretermination hearing.

> b. *Substantive due process*

Jones alleges that the Defendants engaged in conduct that "shocks the conscience" because their conduct resulted in an allegedly unjustified, stigmatizing injury. (Compl. ¶¶ 140, 142.) The stigmatizing reputational injury claim is a procedural due process claim, not a matter of substantive due process. That is, the imposition of a stigma that calls an individual's "good name, reputation, honor, or integrity" into question is not forbidden so long as it is accompanied by sufficient process. Board of Regents v. Roth, 208 U.S. 564, 573 (1972); see also Codd v. Velger, 429 U.S. 624, 627 (1977). The stigma claim should be construed as a component of

Jones's procedural due process claim in count VII and qualified immunity should be granted at this stage for the reasons set out in the preceding section. Jones has alleged a plausible claim that the process she received was not sufficient to excuse a stigmatizing injury associated with her termination, but qualified immunity protects the Movants against personal liability given the vagaries associated with the alleged need for amplified procedural protections beyond notice, explanation, and an opportunity to respond in the context of this particular employment relationship and the evidence required to support the grounds asserted as cause for termination.

Understanding that the stigma concern and the bias concern both come within the procedural due process rubric, there is nothing left to suggest a plausible violation of a clearly established substantive due process right. Although the procedure afforded to Jones may have been inadequate for purposes of due process, there must be something more than a plausible procedural claim to demonstrate conduct outrageous enough to "shock the conscience."

> As distinguished from its procedural cousin, then, a substantive due process inquiry focuses on "what" the government has done, as opposed to "how and when" the government did it. And although the yardstick against which substantive due process violations are measured has been characterized in various ways, we are satisfied that, before a constitutional infringement occurs, state action must *in and of itself* be egregiously unacceptable, outrageous, or conscience-shocking.

Amsden v. Moran, 904 F.2d 748, 754 (1st Cir. 1990). To state a viable substantive due process claim, Jones would have to plead sufficient facts to invite a plausible inference that the Movants intended to cause her injury "in some way unjustifiable by any government interest." County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998). Even if the Movants erred on both procedural and evidentiary questions, such error does not shock the conscience. Discounting the conclusory recitations in the complaint, there are insufficient factual allegations to plausibly suggest that the

Movants set out to harm Jones in the absence of any potential municipal interest.  Consequently, Jones fails to allege a substantive due process claim.

### 2.      *First Amendment*

Jones's ninth count alleges a First Amendment violation based on the idea that she was denied the opportunity to attend the public meeting of the Board on September 13, 2007, after the Board voted to have her removed from her office that evening.  (Compl. ¶ 145;  Opposition Mem. at 10-11.)  The Movants characterize the claim as denial of an opportunity to speak on a matter of public concern.  (Mot. at 15.)  Jones offers no contradiction or any legal authorities in support of her  claim.  She simply offers that, had she been allowed to attend, she would have spoken out against any statement that she had engaged in financial misconduct.  (Opposition Mem. at 10-11.)  In their motion, the Movants say they did not forbid Jones from entering the public forum, but only called for Jones to be escorted out of her office.  They also state that there would have been no public debate on the suspension that evening because there was no action on the agenda concerning Jones, other than to ratify the decision to suspend, which was already reached in executive session.  (Mot. at 15.)

"It is clearly established that when a public official excludes a . . . citizen from a public meeting, she must conform her conduct to the requirements of the First Amendment."  Monteiro v. City of Elizabeth, 436 F.3d 397, 404 (3d Cir. 2006).  Conformity with such requirements, of course, depends on the scenario.  See id. (collecting examples).  Where access to a traditional public forum is at hand, a person may only be excluded when "exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest."  Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U.S. 788, 800 (1985).  Presumably, there must actually be an exercise of authority to exclude.

The allegations in this case reflect a distinction between removal of Jones from her office that evening and removal or exclusion from the public meeting. The only allegation pertaining to exclusion from the public forum is an allegation that Hamlin told the police chief to keep Jones out of the meeting. If Hamlin did so, it does not appear that there was any official Board vote of support for the action. Assuming that such exclusion would generate a First Amendment claim under the circumstances alleged, the allegations only implicate the conduct of Hamlin, not the Movants. The allegations relate only that the Movants voted to have Jones escorted from her office that night in connection with a personnel decision. There is no allegation, for example, that the Movants acquiesced in having Jones removed from the public forum under circumstances that should have made it apparent that Jones wished to attend the public proceeding. The allegations that Jones has made do not support a plausible inference that the Movants would have understood that their September 13, 2007, vote in connection with Jones's suspension and the removal of Jones from her office banned Jones from attending the public meeting scheduled for that evening. Stated otherwise, the requested inference that the Movants excluded her from their public proceedings is not plausible. Jones fails to state a First Amendment claim.

### 3.    *Conspiracy under § 1983*

The sixth count in Jones' complaint alleges "conspiracy under 42 U.S.C. § 1983." The Movants argue that there are no specific allegations of a conspiracy to violate Jones's constitutional rights, only conclusory assertions. (Mot. at 12.) On the issue of a conspiratorial agreement, Jones responds that "[a]ll of the Defendants . . . participated in the conspiracy by being members of the Board of Selectmen of the Town of Milo." (Opposition Mem. at 8.) In effect, she argues that mutual agreement to suspend her and then end her employment is

24

tantamount to a civil rights conspiracy.  Jones's conspiracy theory is not actionable because it is

speculative and implausible.  There are four allegations under the conspiracy heading:

> 122. Plaintiff repeats and realleges each fact in Paragraphs 1 through 121 above as though set forth herein in full.

> 123. Defendants agreed among themselves and conspired to inflict the harm and injury on the Plaintiff.

> 124. The acts of the Defendants resulted in damage to the Plaintiff.

> 125. All Defendants shared the common conspiratorial objective of breaching the Plaintiff's employment contract, defaming the Plaintiff, violating her constitutional rights, and harming her.

In addition to these allegations, Jones offers an allegation that the selectmen met in advance of a

public meeting to agree upon a resolution effecting her employment.  (Compl. ¶ 57.)

"A civil rights conspiracy as commonly defined is a combination of two or more persons

acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the

principal element of which is an agreement between the parties to inflict a wrong against or

injury upon another, and an overt act that results in damages."  Estate of Bennett v. Wainwright,

548 F.3d 155, 178 (1st Cir. 2008) (internal quotation marks omitted).  A party cannot base a

conspiracy claim on conclusory allegations alone.  Id.  "It has long been the law in this and other

circuits that complaints cannot survive a motion to dismiss if they contain conclusory allegations

of conspiracy but do not support their claims with references to material facts."  Slotnick v.

Staviskey, 560 F.2d 31, 33 (1st Cir. 1977).  The only material factual allegations are that the

selectmen met in an unnoticed executive session to prepare the wording of a resolution in

advance of a public meeting.  At most, this simply supports an inference that the selectmen

agreed that Jones should be suspended pending an investigation.  It does not make it plausible

that they conspired to violate the Constitution in the process of removing her from office.  The conspiracy count fails to state a claim.

**B.      State Law Claims**

Jones does not contest the Movants' argument that state law immunizes them against her state law tort claims (counts II through V).  The only state law claim that Jones addresses in her opposition memorandum is her claim for breach of contract (count I).  In her complaint, Jones advances her contract claim against "Defendants," generally, without limiting the claim to the Town of Milo.  (Compl. ¶ 99.)  The Movants argue that they are entitled to judgment against the contract claim because they are not parties to the employment contract.  In their words: "Defendants Beres, Brown and Gallagher contend that the breach of contract claim is more properly pled against the Town of Milo only."  (Mot. at 19.)   Although they offer some comment about the nature of the contract between Jones and the Town, it is clear from the introduction to the pending motion that the Town is not one of the Movants.  (Mot. at 1.) Nevertheless, Jones offers a response, arguing that there was an unwritten contract of employment between herself and the Town and that it was breached.  (Opposition Mem. at 11.) Jones does not explain, however, why she leveled her contract claim at the Movants, individually.  The Movants, obviously, were never Jones's employers and were never party to the employment contract.  Accordingly, the contract claim must be dismissed to the extent it is pressed against them.

CONCLUSION

For the reasons outlined above, I RECOMMEND that the Court GRANT the Movants' Motion to Dismiss (Doc. 10), by dismissing all of the claims against them in either their official

or personal capacities.  The claims against the Town of Milo and Mr. Hamlin remain for further

development.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

June 5, 2009